Filed 7/14/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G059146 |
| v. | (Super. Ct. No. 17CF2740) |
| SIGIFREDO ZENDEJAS LOPEZ, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from an order of the Superior Court of Orange County, Michael A. Leversen, Judge.  Reversed and remanded.

Robert L. Hernandez, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Allison V. Acosta and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

\*              \*              \*

Since 2016, criminal defense attorneys in California have had a statutory duty to "provide accurate and affirmative advice" about potentially adverse immigration consequences of any plea agreement. (Pen. Code, § 1016.3, subd. (a).)[1] Further, when consistent with the defendant's goals and relevant professional standards, defense attorneys have a duty to "defend against those consequences." (*Ibid.*)

Section 1016.3, along with its companion statutes, have changed the law in California with respect to counsel's role. It is no longer necessary for a defendant to clear the high bar of ineffective assistance of counsel in order to establish his or her defense attorney did not meet the relevant standard. Further, what was once adequate advice may no longer meet the statutory requirements of section 1016.3. Such is the case here.

Defendant Sigifredo Zendejas Lopez (Lopez)[2] brought a motion pursuant to section 1018 to vacate his 2019 guilty plea on three felony counts, one of which would lead to almost certain deportation under federal law. Lopez, who was a lawful permanent resident of the United States at the time of his conviction, argued his retained trial counsel failed to provide accurate and affirmative advice about the immigration consequences of the proposed plea. (§ 1016.3, subd. (a).) Lopez's trial counsel testified at the hearing on the motion that he was not aware of the specific immigration consequences of the individual charges Lopez was facing. Therefore, he could not have provided accurate and affirmative advice as to the consequences of a guilty plea to any particular count.

---

[1] Subsequent statutory references are to the Penal Code unless otherwise indicated.

[2] Appellant's name is listed variously in the record as Zendejas, Zendejas Lopez and Zendejas-Lopez, and it is unclear which is correct. The information lists three "also-known-as" versions of appellant's name. If our use of Lopez as a surname is incorrect, we regret the error.

Moreover, trial counsel testified that he tried to negotiate a plea bargain to one misdemeanor count, which was rejected by the prosecution. Had he known the immigration consequences of the specific felony counts, however, there is at least some possibility that he could have negotiated an immigration-neutral plea offer the prosecution was more likely to accept. But as he admitted, he did not know those consequences. Accordingly, he could not adequately attempt to defend against the immigration consequences Lopez was facing, despite knowing Lopez's immigration status. (§ 1016.2, subd. (b).)

Lopez was prejudiced by this course of events. He submitted evidence that he would have taken his chances at trial if he had known and fully understood the immigration consequences of the plea agreement trial counsel negotiated. Because Lopez was not accurately and affirmatively advised, and because there was not an effort to negotiate an acceptable plea bargain with the relevant immigration consequences in mind, we reverse the trial court's order denying the motion to withdraw Lopez's guilty plea in the interests of justice. (§ 1018.)

I

FACTS

*Underlying Case and Guilty Plea*

On April 30, 2015, an Orange County deputy sheriff pulled over Lopez while he was driving his truck. When Lopez could not produce his driver's license, he was asked to step out of the vehicle. According to the deputy, Lopez gave consent for a search, and under the front cup holders, he found a bag that contained half a gram of crystal methamphetamine. In the truck's bed, he found a loaded 12-gauge shotgun. Lopez, according to the deputy, admitted the drugs and shotgun belonged to him. After the deputy administered warnings pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436,

3

Lopez stated the methamphetamine was for his own use.  The deputy later determined the shotgun had been reported stolen.

Approximately two weeks later, on May 13, 2015, the deputy again encountered Lopez's car, which was parked at the time.  The deputy approached Lopez and asked if there was anything illegal in the vehicle.  According to the deputy, Lopez said he might have some marijuana, and the deputy requested consent to search, which Lopez gave.  Between the cup holders and the center console, the deputy found a black pouch with a black piece of plastic tied off on one end and a digital scale.  The scale's weight plate had a white crystalline residue on it.  Inside the black pouch, he found 16 grams of methamphetamine.  Lopez allegedly told the deputy that he had not used methamphetamine since their last encounter on April 30.  In the deputy's opinion, the amount of drugs found and Lopez's statement that he no longer used methamphetamine led him to believe the methamphetamine was possessed for sale.  The deputy was aware that Lopez's statement that he no longer used methamphetamine contradicted his statement from April 30 that he did use the drug.

On November 8, 2016, Lopez was detained on a charge of being in possession of a controlled substance.[3]

In February 2019, the Orange County District Attorney (district attorney) filed an information charging Lopez with the following offenses:  possession of a controlled substance with a firearm on April 30, 2015 (Health & Saf. Code, § 11370.1, subd. (a), count one); carrying a loaded, stolen firearm in public on April 30, 2015 (§ 25850, subds. (a), (c)(2), count two); possession of a controlled substance for sale on May 13, 2015 (Health & Saf. Code, § 11378, count three); and 4) possession of a controlled substance on November 8, 2016 (Health & Saf. Code, § 11377, subd. (a), count four).  Counts one through three were felonies and count four was a misdemeanor.

---

[3] Trial counsel waived the preliminary hearing on this misdemeanor count, thus, we have no further details on what transpired.

Lopez entered a not guilty plea. At the time, he was a lawful permanent resident of the United States and had been so since 1996.

On July 31, 2019, Lopez entered into a plea agreement with the prosecution. He pleaded guilty to the three felony counts, and the misdemeanor count was dismissed by the prosecutor. Lopez initialed and signed the eight-page Orange County "Advisement and Waiver of Rights for A Felony Guilty Plea" (capitalization omitted; the *Tahl* form).[4]

The *Tahl* form included the following statement: "**Immigration consequences**: I understand if I am not a citizen of the United States, the plea or my conviction for the offense(s) charged will have the consequence of deportation, exclusion from admission to the United States, and denial of naturalization pursuant to the laws of the United States."

Lopez's trial counsel signed the following statement, in relevant part: "I have explained to defendant each of the rights set forth on this form. I have discussed the charges and the facts with the defendant. I have studied the possible defenses to the charges and discussed those possible defenses with defendant. I have discussed the possible sentence ranges with defendant. I have advised defendant of immigration consequences and have complied with the requirements of California Penal Code §1016.3(a)."

At the July 2019 hearing, the court held up the *Tahl* form and asked Lopez if he recognized it. The court also asked if Lopez had read the entire form, reviewed it with his attorney, understood it, and initialed and signed it. Lopez replied: "Yes, I do."

After reviewing Lopez's other rights, the court stated: "[I]f you're not a citizen of the United States, your plea will have immigration consequences, such as the

---

[4] See *In re Tahl* (1969) 1 Cal.3d 122, overruled on other grounds by *Mills v. Municipal Court* (1973) 10 Cal.3d 288, 291.

5

denial of naturalization, the exclusion from admission into the United States, or even deportation." Lopez replied: "Yes."

The court suspended sentence and placed Lopez on probation for five years with various terms and conditions. One of the terms was 270 days in jail, but imposition of that time was stayed until October 2019.

In September 2019, Lopez was charged with two additional offenses in separate cases, including possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a)), and receiving stolen property (§ 496, subd. (a)).

In October 2019, Lopez was taken into custody by Immigration and Customs Enforcement (ICE). He was informed that he was at a high risk of deportation because one of his convictions involved drug sales. He was served with a notice that stated he was subject to removal based on his convictions for counts one and three, the two controlled substance felonies.

*Section 1018 Motion*

In January 2020, Lopez filed a motion pursuant to section 1018 to withdraw his plea on the grounds that he had not been properly advised of the immigration consequences of the plea agreement. His accompanying declaration stated that he had paid trial counsel $20,000 to represent him in the underlying case.

At the time he pleaded guilty, Lopez stated, "I did not know that criminal convictions in this case would carry any immigration consequences for me. This is because my defense attorney . . . did not tell me how my pleas would guarantee my detention and deportation by [ICE]. Specifically, he did not explain that ICE could put me in an immigration detention facility and that just one conviction involving a controlled substance meant that I would have no way to get out on bond to keep working and stay with my family, or that I could be in custody for years while I fight my deportation. He also did not tell me that any conviction for a controlled substance makes

6

[a permanent resident] deportable from the U.S. . . . He also did not give me any other options, including any that would avoid deportation."

Lopez also stated that he had told his attorney that around March 2018, he had renewed his permanent resident status and was afraid of deportation. He and his girlfriend, who was expecting a child at the time, "made it very clear that we did not want me to get deported."

The case, Lopez stated, took about another year and a half to resolve. He did not see or hear from his attorney unless they appeared in court. He nonetheless assumed that because he was paying trial counsel, his attorney was "actively defending my interests."

Lopez recalled the date of the plea hearing, July 31, 2019. He met trial counsel at court. Trial counsel "said that he had reached a deal with the prosecutor and gave me a bunch of paperwork to initial and sign. The whole process took maybe five minutes. I trusted [trial counsel] and believed that he would not have gotten me a plea deal that involved me getting deported or become unable to keep working to support my family. Because [trial counsel] had represented me for so long, I did not think that he would tell me to accept a plea deal until he had exhausted all of my defenses and options. He did not say anything to me about immigration consequences." He recalled "the judge reading me a script about guilty pleas in general, but I did not realize that anything about deportation would apply to me because [trial counsel] did not say anything to me about deportation or any other immigration consequences for that matter."

The declaration went on to state that he did not learn about how his plea would impact his immigration status until he spoke to Stephanie Barrera, an employee of a nonprofit called Orange County Justice Fund, while in immigration detention. Barrera explained to him that he was ineligible for release based on his conviction involving a controlled substance and at "very high risk of deportation" because of the conviction involving drug sales. Barrera told him that to have any chance to defend himself, he

7

would need both a postconviction attorney and an immigration attorney. Barrera was eventually able to secure him representation.

Lopez's immediate family lived in the United States, including his parents, who were citizens, and his four children, who were also citizens. He and his family were "completely unprepared" for his likely deportation. Two of his children were adults, including a son who was in the Navy on active duty and a daughter who was in college. He also had two minor children. Prior to his detention, he actively supported all four children, "financially and emotionally." He was also the sole source of support for his girlfriend and one of his minor children, who were living with him at the time he was detained by immigration authorities. Prior to detention, he had been self-employed in construction and worked full time. "My entire life and everything I know are in this country. I have ties only to the U.S. and dependents only in the U.S."

The district attorney opposed the motion, arguing Lopez had not established good cause to withdraw his plea by clear and convincing evidence. The district attorney pointed to both the *Tahl* form and the court's advisement during the plea hearing.

Lopez filed a reply which added some additional facts. A March 2018 note from trial counsel's file supported Lopez's contention that he had told trial counsel he had recently renewed or attempted to renew his permanent resident status. There was no evidence in trial counsel's file that he had conducted any legal research into the immigration consequences of a plea agreement on the counts Lopez was facing.

Lopez's supplemental declaration stated that trial counsel had failed to communicate with him about the immigration consequences of a plea agreement. Although Lopez saw trial counsel many times in court, they never had a meaningful private discussion about the case, including on the day Lopez entered his guilty plea. When trial counsel appeared in court, he sat with other attorneys rather than Lopez. Trial

8

counsel did not speak to him after hearings. "At most, he would only tell me what kind of hearing we would have that day and remind me of when to show up to court next."

With respect to the plea agreement, trial counsel told him "that he made a plea deal and it was the only one I was going to get, which made me think that I had to take it right then and there because of how rushed he seemed. . . . The section [of the *Tahl* form] about immigration consequences was not read to me, and [trial counsel] did not emphasize anything that made me realize that these pleas would guarantee that I would get detained and deported. I really thought [trial counsel] would have discouraged me from pleading guilty if he knew my plea would definitely get me deported." Lopez further stated that immediately after court, he did not understand what he agreed to or what he was supposed to do next. He attempted, but failed, to send trial counsel a text message to ask.

Lopez also submitted a declaration from Barrera, who at that time was a new member of the bar, but was a nonattorney employee of the Orange County Justice Fund at the time she met Lopez in immigration detention in October 2019. She had conducted an initial intake at that time. "During the intake, [Lopez] expressed his surprise at being detained by ICE agents when his criminal defense attorney had explained that the consequences of his criminal convictions were only two-fold: (1) he had to go to a state facility on the weekends, and (2) he had to pay restitution. [¶] . . . [¶] [Lopez] was extremely upset and began crying at this news because aggravated felonies have serious immigration consequences. After a moment to recompose himself, [Lopez] informed me that his criminal defense attorney knew that he was only a lawful permanent resident. [Lopez] had also hired his criminal defense attorney to make sure that he would not face hard time, but had he known there would be adverse immigration consequences, he would have taken a harsher sentence instead."

9

*Hearing on Motion*

A hearing was held on Lopez's motion on March 13, 2020. Trial counsel testified for the prosecution, stating he was an attorney with about 30 years' experience. He had defended "well over a thousand" criminal cases in state and federal court and was a certified criminal law specialist. While he had educated himself "[t]o a certain extent" on the immigration consequences of criminal convictions and "dabbled once or twice," he was not an immigration lawyer.

Trial counsel testified that he had about 20 conversations with Lopez about the case after he was retained. Trial counsel stated that he was aware Lopez was a Mexican citizen with permanent resident status, and stated he spoke to Lopez about the immigration consequences of the case. "These charges are deportable, is generally what I would say to him." He would also tell his client that "the question is can you negotiate the case to something other than a deportable charge." He explained that if avoiding a deportable charge is not possible, he would pursue "ways around getting deported."

Trial counsel explained that "everyone knows, at least we have known for years . . . , if you get into the county jail, there's a strong likelihood the [immigration detention] bus is going to come get you when you leave. [¶] Then the answer is to try to figure out a way not to get into the county jail. If you can get the [monitoring] bracelet [for at-home detention], that's one way around it, or at least you can try that."

He went on to state that another way to avoid being taken into custody by immigration used to be one of a number of city jails that did not check immigration status, but "[s]omething happened. I'm assuming it had to do with the ICE . . . tightening up how they were getting paid. They started to report if somebody was there that didn't

10

have paperwork.  So you couldn't use those jails anymore.  Then you were stuck with trying to get someone on a [monitoring] bracelet."[5]

When asked if he made attempts to obtain a plea offer to other charges, trial counsel said:  "Of course, but the facts of the case were a little difficult to get that."

Trial counsel also testified he went over the *Tahl* form with Lopez in the hallway outside the courtroom.  His practice was to always read the immigration paragraph verbatim, and he specifically recalled doing so in this case.  When asked how much time he spent going over the form, trial counsel responded:  "I don't know.  What are they, 8 pages now?  Seven or 8 pages now?  It would have taken a minute or two.  It takes a while."  Lopez, trial counsel stated, did not ask questions and appeared to understand.

On cross-examination, Lopez's current counsel asked trial counsel how a conviction under section 25850 (possession of a loaded firearm in public) made Lopez deportable.  Trial counsel stated:  "I wasn't talking about each individual charge.  I wasn't worried about the individual charges, Counsel.  I had information.  I'm talking about selling drugs—possession for sale is a deportable charge.  Those charges he would be facing deportation.  That was the issue."

---

[5] As explained *post* (see fn. 7), trial counsel's beliefs about the immigration detention bus and the benefits of one city jail versus another reflected an outdated understanding of the extent to which local law enforcement in California may cooperate with federal immigration authorities.  Further, trial counsel did not testify regarding how this plan would apply to a lawful permanent resident, who is required to provide the federal government with a current address and provide notice within 10 days of any change of address.  (8 U.S.C. § 1305.)  Additionally, the federal government checks for convictions each time a lawful permanent resident renews his or her green card and at the time the resident applies for naturalization.  (See 8 C.F.R. §§ 103.16, 264.5(b)(2), 335.1; see also <https://www.uscis.gov/policy-manual/volume-11-part-b-chapter-2> [Biometrics], [as of July 14, 2021], archived at:  <https://perma.cc/AEM5-4GCY>.)  Therefore, simply keeping Lopez away from ICE would not be an effective long-term strategy.  Such a strategy might or might not work for an undocumented person, but it was doomed to failure in Lopez's case.

Current counsel repeated the question, asking how section 25850 made Lopez deportable. Trial counsel replied: "I don't know that it does or doesn't. That specific charge, I don't know that it does or doesn't." He was reminded that earlier he had testified he told Lopez that "these charges are deportable," referring to the felonies. When asked again about the immigration consequences of a conviction under section 25850, trial counsel answered: "I could be wrong about that. I don't know that one in particular makes him deportable." He stated: "I would have talked to him about possessing methamphetamine for the purpose of sale, which has been deportable as long as I have been a lawyer. It's a problem. It's the kind of thing that gets you deported."

When asked if case law regarding what convictions made a person deportable had changed during his time as a lawyer, trial counsel said, "Probably." He did not know when, most recently, the law had changed regarding sale of a controlled substance. "That's why I advised him this is a deportable charge." Trial counsel did not know in what situations a possession for sale conviction in California would make a defendant deportable. He was also uncertain of the immigration consequences for a firearm offense with a drug offense.

Trial counsel testified he attempted to persuade the prosecutor to agree to a simple possession plea. When asked whether he presented any counteroffer to the prosecutor. Trial counsel stated: "[I] negotiated with [the prosecutor]. [¶] . . . [¶] . . . I would have wanted simple possession." He did not testify about any other offers or counteroffers that he made with respect to a plea agreement for Lopez.

Referring to trial counsel's earlier testimony about trying to avoid having his deportable clients booked into jail, current counsel asked which laws dictate when California law enforcement agencies can inform ICE about the presence of an inmate. Trial counsel did not know. He did not know what an agreement under section 287(g) of

12

the Immigration and Nationality Act[6] was, or what Senate Bill No. 54 (2017-2018 Reg. Sess.) (SB 54)[7] was.

Trial counsel stated he did not do research into whether the charges against Lopez would carry the risk of deportation. He did not consider consulting with an immigration expert. He did not have any independent notes that he had advised Lopez as to the immigration consequences of his plea. From his perspective, the *Tahl* form was the written record.

The court denied the motion,[8] finding that trial counsel had complied with applicable law. Lopez now appeals.

---

[6] Codified at title 8 U.S.C. section 1357(g), this provision of federal law states that the United States Attorney General may enter into an agreement with a state or any of its political subdivisions, pursuant to which qualified personnel may perform the functions of immigration officers with respect to investigating, apprehending, or detaining individuals who are not citizens.

[7] SB 54 is a 2017 California law that prohibited state or local law enforcement agencies from using their resources to enforce federal immigration enforcement laws. SB 54, among other things, amended various provisions of the Government Code, including sections 7282 and 7282.5, and added section 7284. One of SB 54's provisions expressly prohibited any California law enforcement agency from performing the functions of an immigration officer under title 8 U.S.C. section 1357(g). (Gov. Code, § 7284.6, subd. (a)(3).) SB 54 also limited the types of convictions for which a local law enforcement agency was permitted to turn a noncitizen over to federal immigration authorities. (Gov. Code, § 7282.5.) In sum, SB 54 made trial counsel's understanding about the process of county jails turning individuals over to ICE outdated; his beliefs did not reflect the current state of the law.

[8] A clinical law professor also testified and submitted a declaration on Lopez's behalf. The trial court, however, did not consider this testimony in rendering its decision.

13

II

DISCUSSION

*Procedural Framework*

"On application of the defendant at any time before judgment or within six months after an order granting probation is made if entry of judgment is suspended, the court may, and in case of a defendant who appeared without counsel at the time of the plea the court shall, for a good cause shown, permit the plea of guilty to be withdrawn and a plea of not guilty substituted. . . .  This section shall be liberally construed to effect these objects and to promote justice." (§ 1018.)

Lopez entered his guilty plea on July 31, 2019.  On January 28, 2020, he filed his motion to withdraw his plea.  Accordingly, his motion was timely.

"To prevail on a motion to withdraw a guilty plea, a defendant must establish good cause by clear and convincing evidence.  [Citation.]  'Mistake, ignorance or any other factor overcoming the exercise of free judgment is good cause for withdrawal of a guilty plea.'" (*People v. Perez* (2015) 233 Cal.App.4th 736, 741.)


*Standard of Review*

"'''When a defendant is represented by counsel, the grant or denial of an application to withdraw a plea is purely within the discretion of the trial court after consideration of all factors necessary to bring about a just result.'''" (*People v. Nocelotl* (2012) 211 Cal.App.4th 1091, 1096.)  "[J]udicial discretion must be measured against the general rules of law and, in the case of a statutory grant of discretion, against the specific law that grants the discretion." (*Horsford v. Board of Trustees of Cal. State University* (2005) 132 Cal.App.4th 359, 393-394.)  "We do not reweigh the evidence or [assess] witness credibility." (*People v. Tapia* (2018) 26 Cal.App.5th 942, 951.) "[W]hen a trial court's decision rests on an error of law, that decision is an abuse of discretion." (*People v. Superior Court (Humberto S.)* (2008) 43 Cal.4th 737, 746.)

14

We accept the trial court's factual findings to the extent they are supported by substantial evidence. (*People v. Breslin* (2012) 205 Cal.App.4th 1409, 1415-1416.) Substantial evidence is "reasonable, credible, and of solid value." (*People v. Cage* (2015) 62 Cal.4th 256, 275.) Such evidence also "'inspires confidence that the ultimate fact it addresses has been justly determined.'" (*People v. Lehman* (2016) 247 Cal.App.4th 795, 804-805.)

After briefing was complete in this matter, Lopez gave notice that he intended to raise a freshly minted case from the California Supreme Court at oral argument, *People v. Vivar* (2021) 11 Cal.5th 510 (*Vivar*). In *Vivar*, the Court determined that a motion to withdraw a plea under section 1473.7 is reviewed independently rather than for abuse of discretion. Section 1473.7 states, as pertinent here, that a motion to vacate a conviction may be filed by a person no longer in custody when "[t]he conviction or sentence is legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a plea of guilty or nolo contendere." This is not, however, the statute under which Lopez sought relief.

We understand Lopez's reasoning as to why the same standard of review might apply where a motion under section 1018 involves withdrawing a plea due to inadequate advice regarding adverse immigration consequences. But section 1018 also includes all other motions to vacate guilty pleas, while *Vivar*'s reasoning applies specifically to the immigration context of section 1473.7.[9] Further, *Vivar* addressed a situation where the appellate court was reviewing an entirely written record: "Where, as here, the facts derive entirely from written declarations and other documents . . . there is

---

[9] "So our embrace of independent review in this context is a product of multiple factors with special relevance here: the history of section 1473.7, the interests at stake in a section 1473.7 motion, the type of evidence on which a section 1473.7 ruling is likely to be based, and the relative competence of trial courts and appellate courts to assess that evidence." (*Vivar, supra*, 11 Cal.5th at p. 527.)

no reason to conclude the trial court has . . . special purchase on the question at issue; as a practical matter, '[t]he trial court and this court are in the same position in interpreting written declarations' when reviewing a cold record in a section 1473.7 proceeding." (*Vivar*, *supra*, 11 Cal.5th at pp. 527-528.)  Given that the trial court heard live testimony, the facts are also different here.

It is certainly possible that a future case may decide the standard of review articulated in *Vivar* is appropriate in section 1018 cases involving immigration advisements.  But because of the different circumstances of this case, we decline to extend *Vivar* at this juncture.


*Counsel's Duty to Provide "Accurate and Affirmative Advice" Regarding Adverse Immigration Consequences*

The duty of defense counsel to advise clients of adverse immigration consequences of a plea agreement is an evolving area of the law.  In 2010, the Supreme Court in *Padilla v. Kentucky* held that being properly advised of adverse immigration consequences is part of counsel's duty to provide effective representation under the Sixth Amendment.  (*Padilla v. Kentucky* (2010) 559 U.S. 356, 367-368 (*Padilla*).)  Preserving the right to remain in the United States, the Court noted, can be more important to a defendant than remaining out of prison.  (*Id.* at p. 368.)

The California Legislature, citing *Padilla*, subsequently codified the requirement of affirmative and competent counsel about adverse immigration consequences into an independent statutory duty that does not require finding a violation of the Sixth Amendment.  Effective in 2016, section 1016.2 stated the Legislature's intent was to codify *Padilla* and "encourage the growth of such case law in furtherance of justice."  (§ 1016.2, subd. (h).)  Subdivision (e) notes:  "Defendants who are misadvised or not advised at all of the immigration consequences of criminal charges often suffer irreparable damage to their current or potential lawful immigration status, resulting in

16

penalties such as mandatory detention, deportation, and permanent separation from close family.  In some cases, these consequences could have been avoided had counsel provided informed advice and attempted to defend against such consequences."

Also effective in 2016, the newly adopted section 1016.3 set forth defense counsel's obligations:  "(a) Defense counsel shall provide accurate and affirmative advice about the immigration consequences of a proposed disposition, and when consistent with the goals of and with the informed consent of the defendant, and consistent with professional standards, defend against those consequences."  Section 1016.3 also imposes duties on prosecutors when developing and considering plea offers:  "(b) The prosecution, in the interests of justice, and in furtherance of the findings and declarations of Section 1016.2, shall consider the avoidance of adverse immigration consequences in the plea negotiation process as one factor in an effort to reach a just resolution."

Section 1016.5 already required the trial court to ensure that a defendant was advised of immigration consequences before accepting a guilty plea.  This advisement is not merely pro forma, but intended to truly inform and give the defendant time to consider all options:  "[I]t is the intent of the Legislature in enacting this section to promote fairness to such accused individuals by requiring in such cases that acceptance of a guilty plea or plea of nolo contendere be preceded by an appropriate warning of the special consequences for such a defendant which may result from the plea.  It is also the intent of the Legislature that the court in such cases shall grant the defendant a reasonable amount of time to negotiate with the prosecuting agency in the event the defendant or the defendant's counsel was unaware of the possibility of deportation, exclusion from admission to the United States, or denial of naturalization as a result of conviction."  (§ 1016.5, subd. (d).)

17

*Good Cause to Withdraw Plea*

As noted above, our review is for abuse of discretion, and we accept the trial court's factual findings to the extent they are supported by substantial evidence. (*People v. Nocelotl*, *supra*, 211 Cal.App.4th at p. 1096; *People v. Breslin*, *supra*, 205 Cal.App.4th at pp.1415-1416.) Additionally, an error of law constitutes an abuse of discretion. (*People v. Superior Court (Humberto S.)*, *supra*, 43 Cal.4th at p. 746.) The difficulty here is that no statement of decision or written order exists setting forth the trial court's factual findings or explaining its reasoning. Such an order was not required, but it does make our review more challenging. The trial court expressly found that trial counsel "did all that was required of him under the law." We, therefore, conclude the trial court found trial counsel's testimony credible. The court did not, however, find that all of Lopez's testimony lacked credibility. Where they conflict, which is not on any critical fact, we defer to the trial court's finding regarding trial counsel's credibility.

In sum, Lopez argues that because trial counsel failed to advise him of the specific immigration consequences of his guilty plea and options involved, and pursued a disposition that exposed him to mandatory deportation, the court erred by denying his motion to withdraw his plea. The Attorney General argues that Lopez was properly advised by the *Tahl* form and the court's oral advisement. The *Tahl* form, which Lopez initialed and signed, stated his guilty plea *would* result in deportation, rather than using the word "may" as the statutory advisement does. The trial court told Lopez "'your plea will have immigration consequences, such as the denial of naturalization, the exclusion from admission into the United States, or even deportation.'" Lopez, when asked, said he understood.

But depending on the surrounding circumstances, even a trial court's warning that deportation "'*will* result'" is not categorical a bar to relief. (*People v. Camacho* (2019) 32 Cal.App.5th 998. 1011, fn. 8.) Nor is the *Tahl* form's language. "Although the *Tahl* form contains the word 'will' and not 'may,' it, standing alone, is

18

akin to the 'generic advisement' required of the court under Penal Code section 1016.5, subdivision (a) addressed in [*People*] *v. Patterson* [(2017)] 2 Cal.5th [885,] 898 [(*Patterson*)], and it similarly 'is not designed, nor does it operate, as a substitute for such advice' of defense counsel regarding the applicable immigration consequences in a given case." (*In re Hernandez* (2019) 33 Cal.App.5th 530, 545.)

In *Patterson*, the California Supreme Court rejected the contention that the language of the warning in section 1016.5[10] constituted a categorical bar to a finding of good cause to withdraw a plea agreement under section 1018. (*Patterson*, *supra*, 2 Cal.5th at p. 896.) The advice and information defendants receive from their attorneys is critical, and the court's "generic advisement" is not a substitute for that advice. (*Id.* at pp. 897-898.) "'In evaluating the court's [warning], "[t]he defendant can be expected to rely on counsel's independent evaluation of the charges, applicable law, and evidence, and of the risks and probable outcome of trial."'" (*Id.* at p. 896.)

The *Tahl* form and the court's colloquy in this case were a "generic advisement" of consequences. (*Patterson*, *supra*, 2 Cal.5th at pp. 897-898.) The only evidence Lopez had been told a guilty plea *would* result in deportation was the *Tahl* form itself. According to Lopez, the process of reviewing the *Tahl* form "took maybe five minutes." Trial counsel did not seem to know how long the process took, testifying both that it took "a minute or two" and that it took "a while." There was no specific testimony that it took longer than the five minutes Lopez described to review the eight-page *Tahl* form.

It also appears from the *Tahl* form that Lopez robotically initialed almost every line on it, including the prosecutor's, the defense attorney's, and the interpreter's

---

[10] That language is as follows: "If you are not a citizen, you are hereby advised that conviction of the offense for which you have been charged may have the consequences of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States." (§ 1016.5, subd. (a).)

statements. (There was no interpreter used in this case.) It is at best unclear that Lopez read or understood what he was initialing. But even presuming he did, the *Tahl* form, as a "generic advisement" of consequences, does not constitute a bar to relief. (*Patterson*, *supra*, 2 Cal.5th at pp. 898-899.)

The most important fact about the immigration paragraph of the *Tahl* form is that both trial counsel and Lopez agree there was no discussion of it. Thus, there was no substantial evidence from which a reasonable finder of fact could conclude that trial counsel's review of the *Tahl* form with Lopez was anything but brief and pro forma. The review of the *Tahl* form took place in the hallway outside the courtroom, just before the hearing on the plea agreement, which was the first time Lopez heard about the proposed plea. Trial counsel testified that he read the immigration portion verbatim from the form. He did not testify that he explained it or expanded on it, nor did he testify that he and the Lopez had any earlier meetings or phone calls to discuss the plea or its immigration consequences. This type of pro forma review does not satisfy section 1016.3, which requires not only accurate but also "*affirmative* advice" about the immigration consequences of a proposed plea agreement. (Italics added.)

The only other opportunity for Lopez to learn of the immigration consequences of his plea was in the courtroom. To be clear, the trial court read the required warning, but that warning was a general one, and it was not a substitute for counsel's advice. (*Patterson*, *supra*, 2 Cal.5th at p. 898.) A proper advisement by the court does not foreclose the possibility of relief when counsel provides inaccurate or incomplete advice regarding immigration consequences. (*People v. Ogunmowo* (2018) 23 Cal.App.5th 67, 80.) Providing that advice was not the court's responsibility; it was trial counsel's.

The evidence before the trial court, based on trial counsel's testimony, was that trial counsel did not know which of the charges against Lopez carried immigration consequences and what those consequences were. The trial court found this testimony

credible and we find this testimony constitutes substantial evidence of those facts. Trial counsel may have told Lopez "these charges are deportable" without further specifics, testifying that was "generally what I would say." Trial counsel testified that he "wasn't worried about the individual charges." But under the standard of "accurate and affirmative advice" under section 1016.3, the consequences of each individual charge were highly relevant.

Lopez was facing three felony counts, and the immigration consequences of each charge was different and readily ascertainable. Count three, possession of a controlled substance for sale, was an "aggravated felony" under federal law that left Lopez subject to nearly certain deportation. (See 8 U.S.C. § 1227(a); *United States v. Verduzco-Rangel* (9th Cir. 2018) 884 F.3d 918, 920.) From the perspective of immigration law, it was the worst charge Lopez was facing. The firearm-related charge, however, would not necessarily have had adverse immigration consequences. (*United States v. Aguilera-Rios* (9th Cir. 2014) 769 F.3d 626, 637.) Count one, while it would have rendered Lopez deportable, left open the possibility of seeking relief from deportation. (8 U.S.C. § 1229(b).)

Although trial counsel had prior knowledge that possession for sale was a deportable offense, he did not know the immigration consequences of the other felony counts, both of which were less severe. Therefore, he could not and did not explain to Lopez the difference between an aggravated felony which meant virtually certain deportation and a nonaggravated felony which left open the possibility for relief. According to his testimony, he did not perform any legal research into the immigration consequences of the specific charges, which would have revealed this important information. Without this knowledge, trial counsel could not accurately and affirmatively advise Lopez. (§ 1016.3, subd. (a).)

His efforts to defend against adverse immigration consequences were also impeded by his lack of knowledge. (§ 1016.3, subd. (b).) The only plea offer trial

21

counsel testified about discussing with the prosecutor was a simple possession plea. He did not testify about any other offers or counteroffers. The agreement he did negotiate, for probation and 270 days in jail, would almost certainly have been a reasonable one for a defendant for whom immigration was not a concern. But here, immigration was a concern, and the evidence before the trial court was that it was Lopez's paramount concern. Trial counsel was aware of Lopez's immigration status and his attempt to negotiate the simple possession plea shows at least some effort at negotiating an immigration-neutral disposition. It is hardly surprising, however, that the prosecutor refused an offer to plead to one misdemeanor when three felonies were charged.

The issue, again, was trial counsel's lack of knowledge of the immigration consequences of each charge. Given Lopez's goal of avoiding deportation, had trial counsel been aware of those consequences, he could have sought a plea agreement that was more likely to be accepted than simple possession yet avoided the worst of the adverse immigration consequences. For example, he did not try to avoid a conviction on the charge he knew made Lopez deportable, possession for sale, by proposing a plea agreement that involved either of the other felony counts.[11]

"[W]hen the deportation consequence is truly clear . . . the duty to give correct advice is equally clear." (*Padilla*, *supra*, 559 U.S. at p. 369.) Not only was trial counsel's advice not accurate, it was either nonexistent or based on a misapprehension of the surrounding facts and law. Other than telling Lopez "[t]hese charges are deportable," there is nothing in the record to support the contention he gave Lopez accurate and affirmative advice on this consequence. The record, therefore, lacked substantial evidence to conclude that trial counsel met the statutory requirements of section 1016.3.

---

[11] Although the prosecutor also has a duty to consider immigration consequences as one factor in a plea agreement (§ 1016.3, subd. (b)), the record here does not reveal whether that took place.

Trial counsel's own testimony also demonstrated that he harbored a number of beliefs about immigration law that were simply incorrect. He seemed to believe that to avoid deportation, Lopez was required to avoid conviction on all three felony counts: "He would have had to win all of those, at least the felonies, to get past . . . deportation." As explained above, that was incorrect. Further, the strategy he did have—keeping Lopez out of county jail—was based on an outdated understanding of the extent to which local law enforcement officials are permitted to cooperate with ICE following the passage of SB 54. Trial counsel's back-up plan of avoiding county jail was simply an ineffective strategy based on outdated information. (See fn. 7, *ante*, and the discussion of SB 54.) None of trial counsel's testimony on these points provided substantial evidence from which the court could conclude trial counsel satisfied his responsibilities under section 1016.3.

Given his lack of understanding of the relevant law, trial counsel did not fulfill his responsibility to "provide accurate and affirmative advice about the immigration consequences of a proposed disposition, and when consistent with the goals of and with the informed consent of the defendant, and consistent with professional standards, defend against those consequences." (§ 1016.3, subd. (a).) We must, therefore, conclude the trial court's ruling to the contrary was an error of law, and therefore, an abuse of discretion.

*Prejudice*

Next, we must determine whether the denial of Lopez's motion resulted in prejudice. To determine prejudice, we examine whether a defendant has demonstrated a reasonable probability that, but for counsel's lack of competent advice, the defendant would not have decided to plead guilty. (*Patterson*, *supra*, 2 Cal.5th at p. 901; *People v. Martinez* (2013) 57 Cal.4th 555, 562.) "Courts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his

23

attorney's deficiencies. Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences." (*Lee v. United States* (2017) ___U.S.___, ___ [137 S.Ct. 1958, 1967].)

"[D]eportation is an integral part—indeed, sometimes the most important part—of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes." (*Padilla*, *supra*, 559 U.S. at p. 364, fn. omitted.) In *People v. Ogunmowo*, *supra*, 23 Cal.App.5th 67, the court considered a motion to vacate under section 1473.7, which applies the same standard for prejudice relevant here. Accompanying Ogunmowo's motion was a declaration stating he had lived in the United States since he was 17 years old and had been a permanent resident since he was the age of 25. Among other things, his declaration also stated that if he had known a guilty plea would lead to automatic deportation, he would not have entered it. (*Id.* at p. 73.) Reversing the trial court's denial of Ogunmowo's motion to vacate, the appellate court noted that the declaration made clear that Ogunmowo wanted to avoid deportation at all costs, even if that meant a longer prison sentence. (*Id.* at p. 79.)

We have a similar declaration here. Lopez had been a permanent resident since 1996. His parents and four children lived in Orange County, one of whom was a minor. All four children relied upon him for support, and he was was the sole source of support for the minor child as well as his girlfriend, the child's mother. He informed trial counsel of his immigration status, which was supported by trial counsel's records and testimony. Lopez stated: "Had I been advised that I would be in the situation that I am now, I would not have pled guilty." We conclude, based on these facts, that his immigration status was so important to Lopez that he would have gone to trial if that was his only hope of avoiding a conviction on count three, and therefore, almost certain deportation. "[A] defendant might decline to accept an offer if there is little to lose by rejecting it, particularly if acceptance would have significant adverse consequences."

(*People v. Martinez*, *supra*, 57 Cal.4th at p. 564.)  Accordingly, we find Lopez has established prejudice.

Additionally, although it is not a required finding, allowing Lopez to withdraw his plea results in little to no harm to the prosecution.  This is not a case that is 10 or 20 years old, where witnesses have retired, died, or have become impossible to locate, evidence has gone missing, or memories have irrevocably faded.  This case is from 2019.  There is no indication in the record that the prosecution would be precluded from trying this case, if that is the ultimate outcome of granting this motion.  Section 1018 is to be "liberally construed . . . to promote justice."  The equities here favor Lopez, and accordingly, his motion to withdraw his plea should have been granted.


III

DISPOSITION

The order denying Lopez's motion to withdraw his plea is reversed.  The case is remanded for further proceedings.



MOORE, ACTING P. J.

WE CONCUR:


THOMPSON, J.


GOETHALS, J.


25